UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

HEATHER ANDREWS MCGEE
and LAKETHA D. WILSON, on behalf
of themselves and all others similarly
situated,

       Plaintiffs,                                **CLASS ACTION**

vs.

BANK OF AMERICA, N.A.

       Defendant.
_____/

**CLASS ACTION COMPLAINT**

      Plaintiffs HEATHER ANDREWS MCGEE and LAKETHA D. WILSON, on behalf of themselves and all others similarly situated, sue defendant BANK OF AMERICA, N.A., and allege:

**INTRODUCTION**

      1.    Plaintiffs MCGEE and WILSON bring this national class action seeking redress for an illegal practice that BANK OF AMERICA perpetrates on its personal checking and savings account customers. They assert this action pursuant to Fed. R. Civ. P. 23, on behalf of themselves and all others similarly situated, for damages and other relief arising from BANK OF AMERICA's routine practice of wrongfully assessing its customers "extended overdrawn balance charges."

      2.    As alleged below in detail, this purported "charge" is deducted from a customer's account *in addition to* an initial $35.00 overdraft fee if and when the customer's overdrawn status remains in effect for a period of five (5) business days. BANK OF AMERICA, in reality,

1

is charging its customers interest for the use, forbearance, or detention of money. The amount charged far exceeds the permissible limit under the National Bank Act.

## PARTIES

3. Plaintiff MCGEE is a citizen and resident of the State of Florida, and at all times material hereto had both a personal checking account and a personal savings account with defendant BANK OF AMERICA in Fort Lauderdale, Florida. The transactions at issue in this lawsuit occurred in part while these accounts were in her maiden name "Heather Andrews."

4. Plaintiff WILSON is a citizen and resident of the State of Florida, and at all times material hereto had both a personal checking account and a personal savings account with defendant BANK OF AMERICA in Live Oak, Florida.

5. Upon information and belief, defendant BANK OF AMERICA is a national association with its organization certificate and principal place of business in the State of North Carolina. BANK OF AMERICA is one of the largest national banks in the United States, with approximately 48 million customer relationships and approximately 4,800 retail banking offices.

## JURISDICTION

6. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, namely the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

7. BANK OF AMERICA regularly and systematically provides retail banking services throughout the State of Florida, including in this district, and provides retail banking services to its customers, including MCGEE, WILSON and members of the putative Class. As such, it is subject to the jurisdiction of this Court and the mandate of the National Bank Act.

**VENUE**

8. Venue is likewise proper in this district pursuant to 28 U.S.C. § 1391 because BANK OF AMERICA is subject to personal jurisdiction in this Court and regularly conducts business within this district through its numerous branches. Additionally, a substantial part of the events giving rise to the claims asserted herein occurred and continue to occur in this district.

**OVERVIEW**

9. The gist of the "extended overdrawn balance" practice is as follows: If Customer "A" were to overdraft his or her account by $500.00, the bank would first charge an overdraft fee of $35.00 per transaction. However, if Customer "A" were to fail to bring the balance to a positive figure within five (5) business days, then in such event the bank would deduct yet another $35.00 from the account of Customer "A" for having extended this credit.

10. Unlike an initial overdraft fee, the extended overdrawn balance charge is an *additional* charge to a customer based solely on the alleged indebtedness to the bank remaining unpaid by the customer for a period of time.

11. By way of background, overdraft fees have been a substantial source of revenue for banks, and today those numbers are proliferating. As technology has rapidly grown and provided banking customers new ways of accessing the money in their accounts, overdraft episodes and the attendant imposition of overdraft fees have skyrocketed. Recent reports from the federal Consumer Financial Protection Bureau ("CFPB"), for example, show that a broad investigation has been launched regarding bank overdraft practices and procedures due to its concern that the growing cost of overdraft practices could place banking customers at unnecessary risk. In 2012 alone, banks took in approximately $32 billion in overdraft-related fees.

12. As a recent CFPB report reflects, "sustained negative balance" fees are becoming popular with banks and account for nearly 10% of total overdraft-related fees collected by banks which impose such charges. According to its latest report issued in July of 2014, most negative balance episodes last for a very short time. Once a bank has collected this extra charge, the negative balance is likely cured by the customer within just a few days, rather than weeks. As such, the bank's extension of credit to its overdrawn customer is typically very short-term. Moreover, most negative balances created by an overdraft are not high figures. Nearly two-thirds of transactions that cause overdrafts were for $50 or less. As these statistics highlight, a bank's exposure for carrying a customer's overdraft is ordinarily very small and limited. But rather than charging legally permissible interest until its customer cures the overdraft balance, the bank instead charges a purported "fee" that in reality is interest at an illegal rate.

## BANK OF AMERICA'S PRACTICE

13. The specific issue in this case is BANK OF AMERICA's bad-faith practice of deducting "extended overdrawn balance charges" from the accounts of its customers, including MCGEE, WILSON and others similarly situated. Under this practice, when the customer fails to repay the full amount of the overdraft within five (5) business days, the bank imposes an extended overdrawn balance charge of $35.00 -- as reflected on BANK OF AMERICA's Personal Schedule of Fees. Significantly, BANK OF AMERICA renders no service to its customers in exchange for this extra charge other than advancing money to a customer's account in an amount to cover the overdraft. BANK OF AMERICA uses the fact that it has loaned funds to its customer as a pretext to justify charging that customer a secondary service charge that exceeds lawful interest limits. The label that BANK OF AMERICA chooses to place on this extra charge, however, does not remove it from the legal definition of "interest" and exempt it from usury laws.

14. In BANK OF AMERICA's written "Deposit Agreement and Disclosures" with its customers including plaintiffs MCGEE and WILSON, the relevant provision appears on page 12:

**Extended Overdrawn Balance Charge**

The Extended Overdrawn Balance Charge is an overdraft fee. This fee is in addition to Overdraft Item and NSF: Returned Item fees that may apply to your account for each overdraft or returned item. This additional charge applies to your account when we determine that your account has been overdrawn for 5 or more consecutive business days. You can avoid this fee by promptly covering your overdraft - deposit or transfer enough available funds to cover your overdraft, plus any fees we assessed, within the first 5 consecutive business days that your account is overdrawn.

Please see the Schedule of Fees for your account for more information about this fee.

The referenced Schedule of Fees then sets forth the following three bullet points about this charge:

- The Extended Overdrawn Balance Charge applies when we determine that your account has been overdrawn for 5 or more consecutive business days. You can avoid this fee by depositing enough available funds in your account to cover your overdraft plus any fees we assessed within the first 5 consecutive business days that your account is overdrawn.

- For each time that your account is overdrawn 5 or more consecutive business days, we charge one Extended Overdrawn Balance Charge. We charge the fee after the 5th consecutive business day. The Extended Overdrawn Balance Charge is in addition to applicable Overdraft Item Fees and NSF: Returned Item Fees.

- If an everyday non-recurring debit card transaction or an ATM transaction, for which you did not agree to our overdraft practices, is the transaction that causes your account to become overdrawn, we do not start the 5-business day period. We do start the 5-business day period if another type of transaction either causes or increases the overdraft on your account.

15. Under the provisions set forth in the prior paragraph, BANK OF AMERICA allows itself to charge any checking or savings account merely by virtue of the customer failing

5

to pay the bank a specific sum of money (the amount of the "overdraft plus any fees") for a period of five (5) business days. There is nothing in BANK OF AMERICA's written materials disclosing that this additional "charge" is in reality interest on extended credit.

16. As for MCGEE, her monthly bank statements for her personal "Regular Checking" account show that BANK OF AMERICA imposed an extended overdrawn balance charge on at least four separate occasions while the account was open and that her account was "force closed" in December of 2014. The first extended overdrawn balance charge of $35.00 was deducted from her account on January 23, 2014. MCGEE does not currently have a copy of the bank statement showing the underlying transactions related to her alleged overdrawn status at that time. However, she does have bank statements that reflect the transactions related to the other three extended overdrawn balance charges that BANK OF AMERICA imposed on her. Those bank statements show that each time such a charge was imposed, it was *in addition to* other overdraft charges that gave rise to the very same overdrawn balance. More specifically:

(a) *March 19, 2014*: BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from MCGEE's account *in addition to* charging her an overdraft item fee of $35.00 on March 12, 2014.

(b) *April 29, 2014*: BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from MCGEE's account in addition to charging her an overdraft item fee of $35.00 on April 22, 2014.

(c) *August 14, 2014*: BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from MCGEE's account in addition to charging her an overdraft item fee of $35.00 on August 7, 2014.

17. From analyzing the line items appearing on MCGEE's bank statements, it is further apparent that the transactions which caused her extended overdrawn status were usually

6

in modest amounts and that her negative balance would have been *at most* between ($322.49) to ($677.24). In this regard, her bank statements show:

(a) *March 19, 2014*: There appear to be, at most, five transactions giving rise to her extended overdrawn balance on this date -- two checkcard transactions totaling $30.44 on March 12, 2014; a withdrawal of $40.00 on the same day; an ATT payment of $378.89 that same day; and another checkcard transaction for $140.96 on March 13, 2014. Adding these amounts to the $35.00 overdraft item fee that BANK OF AMERICA charged her on March 12, 2014 yields a negative balance during this period that would not have exceeded ($625.29).

(b) *April 29, 2014*: The transaction giving rise to her extended overdrawn balance on this date appears to be a U.S. Bank payment of $642.24 on April 22, 2014. Adding that figure to the $35.00 overdraft item fee that BANK OF AMERICA charged her that day yields a negative balance during this period that would not have exceeded ($677.24).

(c) *August 14, 2014*: The transaction giving rise to her extended overdrawn balance on this date appears to be an ATT payment for $287.49 on August 7, 2014. Adding that figure to the $35.00 overdraft item fee that BANK OF AMERICA charged her that day yields a negative balance during this period that would not have exceeded ($322.49).

18. As for WILSON, her monthly bank statements for her personal "Tiered Interest Checking" account show that BANK OF AMERICA imposed an extended overdrawn balance charge on at least four separate occasions. Each time such a charge was made it was *in addition to* multiple other overdraft/NSF charges that gave rise to the very same overdrawn balance:

(a) *December 10, 2013*: BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from WILSON's account *in addition to* charging her an overdraft item fee of $35.00 on December 3, 2013 *and* an overdraft item fee of $35.00 on December 6, 2013.

(b) *December 26, 2013*:  BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from WILSON's account *in addition to* charging her two overdraft item fees totaling $70.00 on December 18, 2013 *and* an NSF returned item fee of $35.00 on December 23, 2013.

(c) *May 27, 2014*:  BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from WILSON's account *in addition to* charging her two overdraft item fees totaling $70.00 on May 19, 2014.

(d) *June 23, 2014*:  BANK OF AMERICA deducted an extended overdrawn balance charge of $35.00 from WILSON's account *in addition to* charging her two overdraft item fees totaling $70.00 on June 16, 2014.

19. WILSON's bank statements further revealed that the extended overdrawn balance charges in her account were based on negative balances that ranged *at most* from ($225.25) to ($1,336.14).  More specifically:

(a) *December 10, 2013*:  The two transactions giving rise to her extended overdrawn balance on this date appear to be an FPL debit for $94.00 on December 3, 2013 and a check for $61.25 on December 6, 2013.  Those two amounts -- plus the $70.00 in overdraft item fees that BANK OF AMERICA charged for those two items -- yields a negative balance during this period that would not have exceeded ($225.25).

(b) *December 26, 2013*:  The three transactions giving rise to her extended overdrawn balance on this date appear to be two checks for $30.00 and $61.25 on December 18, 2013, and a "specialized loan" for $1,139.89 on December 23, 2013.  Those three amounts -- plus the $105.00 in overdraft/NSF fees that BANK OF AMERICA charged her for those items -- yields a negative balance during this period that would not have exceeded ($1,336.14).

(c) *May 27, 2014*: There appear to be, at most, six transactions giving rise to her extended overdrawn balance on this date -- four checkcard debits totaling $144.86 on May 19, 2014; a GE Capital charge of $40.00 on May 19, 2014; and a check for $200.00 on May 19, 2014. Adding these amounts to the $70.00 in overdraft item fees that BANK OF AMERICA charged for these items yields a negative balance during this period that would not have exceeded ($454.86).

(d) *June 23, 2014*: There appear to be, at most, six transactions giving rise to her extended overdrawn balance on this date -- four checkcard debits totaling $124.98 on June 16, 2014; a "T2P" charge for $49.99 on the same day; and an ADT Security charge for $39.58 on that day as well. Adding these amounts to the $70.00 in overdraft item fees that BANK OF AMERICA charged for these items yields a negative balance during this period that would not have exceeded ($284.55).

## CLASS ACTION ALLEGATIONS

20. MCGEE and WILSON bring this action on their own behalf and all others similarly situated pursuant to Fed. R. Civ. P. 23. The Class includes:

> All holders of a BANK OF AMERICA personal checking and/or savings account who, within the two-year period preceding the filing of this lawsuit, incurred one or more extended overdrawn balance charges.

21. Excluded from the class are BANK OF AMERICA, its subsidiaries and affiliates, its officers, directors and member of their immediate families and any entity in which defendant has controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

9

22. MCGEE and WILSON reserve the right to modify or amend the definition of the proposed Class and/or to add Subclasses if necessary before this Court determines whether certification is appropriate.

23. This case is properly brought as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and all requirements therein are met for the reasons set forth in the following paragraphs.

24. *Numerosity under Fed. R. Civ. P. 23(a)(1)*. The members of the Class are so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to BANK OF AMERICA's records. BANK OF AMERICA has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to plaintiffs.

25. *Commonality under Fed. R. Civ. P. 23(a)(2)*. There are numerous questions of law and fact common to the Class relating to BANK OF AMERICA's usurious business practice at issue herein and those common questions predominate over any questions affecting only individual Class members. The common questions include, but are not limited to:

    a) Whether BANK OF AMERICA charged interest to its customers under the guise of an "extended overdrawn balance charge" in amounts that violate applicable usury laws;

    b) Whether BANK OF AMERICA developed and engaged in an unlawful practice that mischaracterized or concealed the true usurious nature of the "extended overdrawn balance charge";

    c) Whether BANK OF AMERICA imposed a charge on its customers that bears no relationship to the actual costs and risks of covering insufficient funds transactions; and

    d)  Whether MCGEE and WILSON and other members of the Class have sustained damages as a result of BANK OF AMERICA's wrongful business practice described herein, and the proper measure of damages.

  26. *Typicality under Fed. R. Civ. P. 23(a)(3)*.  MCGEE and WILSON'S claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by BANK OF AMERICA, as described herein.

  27. *Adequacy of Representation under Fed. R. Civ. P. 23(a)(4)*.  MCGEE and WILSON are more than adequate representatives of the Class in that they have BANK OF AMERICA personal checking accounts and have suffered damages as a result of BANK OF AMERICA's usurious business practice.  In addition:

    a)  MCGEE and WILSON are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

    b)  There is no hostility of interest between MCGEE and WILSON and the unnamed Class members;

    c)  They anticipate no difficulty in the management of this litigation as a class action; and

    d)  MCGEE and WILSON's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

  28. *Predominance under Fed. R. Civ. P. 23(b)(3)*. The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues.  As such, the "commonality" allegations (paragraph 25 and subparts) are restated and incorporated herein by reference.

29. *Superiority under Fed. R. Civ. P. 23(b)(3).*  A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of BANK OF AMERICA are enormous, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and BANK OF AMERICA's misconduct will proceed without remedy.  In addition, even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

30. All conditions precedent to bringing this action have been satisfied and/or waived.

## VIOLATION OF NATIONAL BANK ACT
## (12 U.S.C. §§ 85, 86)

31. Plaintiffs MCGEE and WILSON reallege and incorporate all allegations in paragraphs 1 through 30 as if set forth fully herein.

32. Interest, by definition, is compensation for the use or forbearance of money or as damages for its detention.  That is exactly the nature of and basis for BANK OF AMERICA's "extended overdrawn balance charge."  Any such charges imposed on a customer for use or forbearance of money or as damages for its detention -- no matter how labelled by BANK OF

AMERICA -- are in fact interest and in this case usurious, as explained more fully below.

33. Claims for usury against a national bank such as BANK OF AMERICA are governed exclusively by certain provisions in the National Bank Act -- specifically, 12 U.S.C. §§ 85, 86. Under § 85, a national bank may charge interest on any loan or debt at the *greater* of two options. Option (1) is "the rate allowed by the laws of the State ... where the bank is located." And option (2) is "1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located."

34. Under option (1), a bank is "located" only in the state that is designated in its organization certificate. Upon information and belief, BANK OF AMERICA is located in North Carolina. Under North Carolina law, the "legal rate of interest shall be eight percent (8%) per annum for such time as interest may accrue, and no more." N.C.G.S.A. § 24-1.

35. Under option (2), the discount rate for the Federal Reserve Bank of Richmond (which covers North Carolina) was .75% for primary credit and 1.25% for secondary credit at all times material. As such, the maximum rate under option (2) would be 2.25%.

36. Since option (1) is greater than option (2), 8% would be the maximum interest rate that BANK OF AMERICA could legally charge its customers in this context under 12 U.S.C. § 85.

37. By covering overdrafts, BANK OF AMERICA has knowingly extended credit to MCGEE, WILSON and others similarly situated for use in their personal checking and/or savings accounts. Such extensions of credit are *de facto* loans made without a specific loan agreement. In fact, 12 U.S.C. § 84 defines the term "loans and extensions of credit" as including any and all direct or indirect advances of funds to a person made on the basis of any obligation of that person to repay the funds. This statement describes exactly what BANK OF AMERICA

13

does -- it advances funds and expects the customer to repay those advanced funds.

38. Although BANK OF AMERICA is only permitted to charge MCGEE, WILSON and others similarly situated a *maximum* of 8% annualized interest on these *de facto* loans and extensions of credit, BANK OF AMERICA has knowingly charged and collected extended overdrawn balance charges from MCGEE, WILSON and others similarly situated that far exceeded this permissible rate.

39. Using the maximum amount of MCGEE's overdraft during the relevant period ($677.24) and applying an 8% annual interest rate over a 5 business day period (typically 7 calendar days), the maximum amount that BANK OF AMERICA was legally permitted to charge MCGEE was only $1.04. Instead, BANK OF AMERICA charged her $35.00 for that 5 business day period -- which is over 33 times the maximum legal amount.

40. A charge of $35.00 for a 5 business day period on MCGEE's negative balance which fluctuated at most from ($322.49) to ($677.24) translates to an effective annualized interest rate between approximately 269% and 566%.

41. Using the maximum amount of WILSON's overdraft during the relevant period ($1,336.14) and applying an 8% annual interest rate over a 5 business day period, the maximum amount that BANK OF AMERICA was legally permitted to charge WILSON was only $2.05. Instead, BANK OF AMERICA charged her $35.00 for that 5 business day period -- which is over 17 times the maximum legal amount.

42. A charge of $35.00 for a 5 business day period on WILSON's negative balance which fluctuated at most from ($225.25) to ($1,336.14) translates to an effective annualized interest rate between approximately 136% and 810%.

43. The extended overdrawn balance charges imposed on MCGEE and WILSON and others similarly situated for such advances of money are egregiously high, usurious and illegal.

44. By using an "extended overdrawn balance charge" label, BANK OF AMERICA cannot mask the true nature of the charge.

45. As a direct and proximate result of BANK OF AMERICA's statutory breaches, MCGEE, WILSON and those similarly situated have sustained damages.

46. The usurious transactions at issue all occurred less than two years prior to the date of this action.

47. MCGEE, WILSON and those similarly situated are entitled to recover twice the amount of the usurious interest they have paid under 12 U.S.C. § 86, which provides:

> In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, *twice the amount of interest thus paid from the association taking or receiving the same*…. (Emphasis added)

48. MCGEE, WILSON and those similarly situated hereby demand recovery of the amounts owed to them as a result of the violations asserted herein.

WHEREFORE, plaintiffs MCGEE and WILSON demand judgment against defendant BANK OF AMERICA for themselves and the Class members as follows:

(a) Certifying this matter as a class action pursuant to Fed. R. Civ. P. 23;

(b) Designating MCGEE and WILSON as appropriate Class representatives;

(c) Awarding MCGEE and WILSON and the Class damages (including twice the amount of the usurious interest paid), prejudgment interest from the date of loss, and their costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs; and

(d) Granting such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs MCGEE, WILSON and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated:  March 9, 2015                              Respectfully submitted,


/s/ *John J. Uustal*
John J. Uustal, Esquire
Fla. Bar No. 073547
jju@kulaw.com
mah@kulaw.com
**Kelley Uustal, PLC**
700 S.E. 3rd Avenue, Suite 300
Fort Lauderdale, FL  33316
Telephone: (954) 522-6601
Facsimile:  (954) 522-6608
*Attorneys for plaintiff and putative Class*

-   and   -

John R. Hargrove, Esq.
Fla. Bar. No. 173745
jrh@hargrovelawgroup.com
cmp@hargrovelawgroup.com
**Hargrove Pierson & Brown P.A.**
21 S.E. 5th Street, Suite 200
Boca Raton, FL 33432
Telephone: (561) 300-3900
Facsimile:  (561) 300-3890
*Attorneys for plaintiff and putative Class*

-   and   -

Kristin Daniella Figueroa-Contraras, Esq.
Fla. Bar. No. 643394
kristy@negri-torres.com
**Negri, Torres & Figueroa-Contreras, PLLC**
The Minorea
2030 S. Douglas Road, Suite 214
Coral Gables, Florida 33134
Telephone: (305) 639-8599
Facsimile: (305) 397-1384
*Co-counsel for plaintiff and putative Class*

    - and -

Osvaldo A. Raponi
T 28 F 821 (Buenos Aires Bar Association)
Raponi & Urtubey Abogados
Av. Pte. Roque Saenz Pena 885 P.4
CABA, Buenos Aires, Argentine
Telephone: 54 11 4327 2466
Facsimile: 54 11 4327 2466
*Co-counsel for plaintiff and putative Class*